**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COLLECTIONS MARKETING CENTER, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>APOLLO ENTERPRISE SOLUTIONS, INC., a Delaware Corporation,<br><br>Defendant. | ) | C.A. No. 10-cv-101057-BMS<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**
**PURSUANT TO TITLE 28 U.S.C. § 2201(a)**

Plaintiff Collections Marketing Center, Inc. ("CMC") brings this First Amended Complaint against Defendant Apollo Enterprise Solutions, Inc. ("Apollo") for a Declaratory Judgment that: (1) Plaintiff has not infringed United States Patent No. 7,848,978; (2) United States Patent No. 7,848,978 is invalid pursuant to 35 U.S.C. §§ 101, 102, 103, and 112; (3) United States Patent No. 7,848,978 is unenforceable; and, (4) this is an "exceptional" case under 35 U.S.C. § 285 and for an award of all of Plaintiff's Attorneys' Fees and Costs.

**THE PARTIES**

1. Plaintiff Collections Marketing Center, Inc. is a Delaware Corporation with a principal place of business at 300 Water Street, Wilmington, Delaware 19801.

2. Defendant Apollo Enterprise Solutions, Inc., is a Delaware Corporation with a principal place of business at 111 W. Ocean Blvd., Suite 1750, Long Beach, California 90802, formerly 2101 Business Center Drive, Suite 215, Irvine, California 92612, and Corporation

Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 is its registered agent for service of process in the State of Delaware.

**JURISDICTION AND VENUE**

3. Plaintiff bring this action under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* and the Patent Act of the United States, 35 U.S.C. §§ 101, *et seq.*

4. This Court has subject matter jurisdiction over this matter under Title 28 U.S.C. § 1331 (Federal Question) and § 1338(a) (Patent).

5. Venue is proper in this District pursuant to Title 28 U.S.C. §§ 1391(b)(1), (2) and (c) because Apollo is a Delaware Corporation, a substantial part of the events giving rise to this action occurred within this Judicial District, and because a corporation defendant shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction.

**FACTUAL BACKGROUND**

6. Plaintiff CMC offers fully integrated, multi-channel, adaptive collections services to maximize client cost-performance.

7. CMC offers a browser-accessible credit and collections software on a Software-as-a-Service basis, marketed directly to various financial institutions and credit card companies as well as through third-party reseller partners.

8. On March 9, 2006, Apollo filed U.S. Patent Application No. 11/372,588 for the invention, a "Enhanced Transaction Resolution Techniques." Said Patent Application was Published on July 5, 2007 (Publ. No. US 2007-0156580 A1), granted on December 7, 2010, and assigned issue No. 7,848,978 (the "'978 Patent"). (*See* Issue Notification, Notice of Allowance and Accepted Amendments to Application (attached hereto as Exhibit "A").)

9. The '978 Patent discloses an invention for discreet components of a web-based debt collections software.

## APOLLO'S KNOWLEDGE OF CMC'S SOFTWARE

10. As part of CMC's business model, it offers its browser-accessible credit and collections software solutions directly to customers (banks, credit card companies, etc.) on a managed service basis from its own hosted computers, providing a standard "out-of-the-box" specified service level and feature set and making further custom modifications to its products as necessary to meet the particular needs of its customers.

11. CMC also offers, via the same managed service method, similar software-based solutions to banks through third party reseller partners who contract with their clients to bring CMC's services to them. One such vendor is Total System Services, Inc. ("TSYS"), a customer and reseller-partner with CMC since at least as early as July 2009.

12. Apollo representatives have viewed public demonstrations of the CMC software at trade shows, at industry conventions, and during an hour-long, more detailed, private demonstration, given pursuant to a nondisclosure agreement at Plaintiff's offices on September 7, 2007.

13. Based on the Apollo representative's review of the public and private demonstrations of the CMC software, Apollo knew or should have known that the CMC software does not contain a capability for allowing real-time accessing of credit bureau information as set forth in the '978 Patent claims.

## APOLLO'S THREATS OF PATENT LITIGATION

14. On September 9, 2010, Apollo's Counsel sent a Cease and Desist letter (the "TSYS Cease and Desist Letter") to TSYS, advising TSYS of a prior Orange County, California Action and Delaware Chancery Court Action between Apollo and CMC. (*See* Letter from Apollo's Counsel to TSYS (Sep. 9, 2010) (attached hereto as Exhibit "B").)

15. The TSYS Cease and Desist Letter also advised TSYS of six then-pending Apollo U.S. Patent Applications, listing the Application Number and title of the invention, including the '978 Patent (formerly U.S. Patent Application No. 11/372,588 for the invention, a "Enhanced Transaction Resolution Techniques").

16. The TSYS Cease and Desist Letter warned TSYS that it may also be subject to "significant liability" and that "Apollo vigorously enforces its intellectual property rights and shall be forced to pursue any and all available legal remedies against TSYS if you chose to ignore this letter."

17. The TSYS Cease and Desist Letter also appeared to demand that TSYS to enter into an agreement to pay "adequate consideration" to Apollo or be sued.

18. Upon information and belief, Apollo's TSYS Cease and Desist Letter threatens TSYS that unless it makes payment to Apollo for what it believes to be infringing use of the Apollo Patent, Apollo will file a Patent Infringement lawsuit against TSYS.

19. As a result of the TSYS Cease and Desist Letter, TSYS contacted CMC about the condition of CMC's software and the basis for Apollo's claims for infringement.

20. Upon information and belief, Apollo has also sent a similar Cease and Desist letter to Barclays Bank located in Delaware, making similar infringement allegations as threatened against TSYS.

21. In addition, CMC is aware of Apollo salespeople warning at least two separate CMC customers and clients that Apollo plans to sue CMC and others for Patent Infringement when their Patents Issue.

22. The instant action is necessary to address the specific issue as to whether CMC's actions in the development, distributions, offer for sale and sale of its browser-accessible credit

and collections software solutions, CMC's actions are lawful and not violative of any of Defendant's rights, as there now exists a substantial controversy as to CMC's ability to continue with its business, offering CMC's software and maintaining accounts with customers such as TSYS and others, in light of said claims.

23. Defendant has placed CMC in a position of either pursing allegedly illegal behavior or abandoning that activity which CMC claims a right to pursue, that is continuing to offer CMC's competing browser-accessible debt collection software.

24. Defendant's claims of Patent Infringement directed at TSYS, at others, and indirectly at CMC, are made in bad faith, as from Apollo's reviews of public versions of the CMC software, and private demonstration in September 2007, it knew or should have known that the CMC software does not contain any of the claimed inventions in the '978 Patent.

25. There exists no reasonable basis to conclude that the CMC's browser-accessible credit and collections software solution has infringed the Apollo software product.

26. Defendant's bad faith threats and claims of patent infringement without a reasonable basis for same constitute bad faith, entitling CMC to all of its attorneys' fees and costs in bringing/defending this action.

**UNENFORCEABILITY OF THE '978 PATENT FOR INEQUITABLE CONDUCT**

27. Inequitable conduct involves an intentional breach of a patent applicant's duty of candor (*see* 37 C.F.R § 1.56) to the United States Patent Office (hereinafter, "PTO") during the process of applying for (*i.e.*, "prosecuting") a patent. Inequitable conduct occurs when any individual substantively involved in the preparation or prosecution of a patent application, with (a) specific intent to mislead or deceive the PTO examiner, (b) fails to disclose material information or submits materially false information to the PTO during prosecution. In other

words (regarding specific intent), the applicant knew of the undisclosed reference, knew that it was material, and made a deliberate decision to withhold it. Further (regarding materiality), "but-for" the patentee's deliberate failure to disclose material prior art, the PTO would not have allowed the claim.

28. The '978 Patent is unenforceable because of Apollo's inequitable conduct during the prosecution of the application that issued as the '978 Patent, U.S. Application No. 11/372,588 (hereinafter, "the '978 Application") and for misconduct during the prosecution of related applications which infect the '978 Patent because each of Apollo's patent applications claim priority to the same provisional patent application and multiple claims in these related applications recite the same subject matter claimed in the '978 Patent.

29. Apollo's pattern of misconduct before the PTO makes this an exceptional case under 35 U.S.C. § 285. CMC is entitled, at least, to a declaration of unenforceability of the '978 Patent and to their attorneys' fees to defend against Apollo's wrongful patent assertions, which include not only Apollo's infringement assertions in the instant case but also Apollo's wrongful accusations of patent infringement to CMC's customers prior to the filing of this declaratory judgment suit.

30. Apollo's representatives, including at least the first listed "inventor" on the '978 Patent, G. Christopher Imrey ("Imrey"), and his patent counsel, engaged in at least seven separate categories of wrongful misconduct before the PTO. Each category of inequitable conduct would alone be sufficient to make this case exceptional under § 285. These seven instances, when considered together, establish a pattern of Apollo's conduct of deception that demonstrates such malfeasance and violation of a patent applicant's duty of candor, as to compel a determination of unenforceability and exceptionality in this case.

31. The inequitable conduct by Apollo includes, at least, the following categories of information withheld from the PTO by Imrey during the period in which he had a duty to disclose this non-cumulative, highly material information to the PTO: (1) the Bridgeforce Whitepaper published in July 2003 entitled "The Future of Collections Management"; (2) the Bank of America online collections system at www.myeasypayment.com designed and implemented by Douglas-Danielle, Inc. in 2001 and replaced by Apollo in 2006; (3) prior art online collections systems (*e.g.*, Chase, Incurrent, ORCC) known to Imrey because of his panel participation at industry conferences; (4) material rejections made against similar claims in at least five co-pending patent applications that were/are examined by PTO examiners different from the examiner for the '978 Patent and dozens of prior art patents cited in those applications; (5) the Global Collection Systems, Inc. web collection system (www.GlobalCollectionSystems.com); (6) information concerning a patent litigation filed against Apollo by Debt Resolve, Inc. ("Debt Resolve Litigation"), which Imrey admitted was related to his own pending patent claims; and (7) the Debt Resolve online collections system (www.debtresolve.com).

***<u>The Bridgeforce Whitepaper Published in July 2003.</u>***

32. In addition to his being listed as the primary named "inventor" on the '978 Patent, Imrey is also the founder and former President of Apollo, and its current Chief Strategy Officer. (*See* Declaration of G. Christopher Imrey ("Imrey Decl."), *Bank of Am. v. Apollo Enter. Solutions, LLC et al.*, Civil Action No. 10-5707 (DLC), at ¶ 1 (S.D.N.Y. Aug. 16, 2010) (attached hereto as Exhibit "C").)

33. Upon information and belief, Bridgeforce and the information it shared to the financial industry regarding debt collection practices were well known to Imrey prior to the filing

of his earliest patent application. In July 2003, Bridgeforce published a Whitepaper entitled "The Future of Collections Management" in July 2003 (hereinafter, "Bridgeforce Whitepaper"). (*See* William Groves, "The Future of Collections Management," Vision and Strategy Document, Bridgeforce, Inc. (July 21, 2003) (attached hereto as Exhibit "D").)

34. Upon information and belief, the Bridgeforce Whitepaper was well known to Imrey at least during, if not before, the period in which he had a duty of disclosure to the PTO. The duty of disclosure for the '978 Patent is the term of the prosecution of the '588 Application, which ran from its filing date through its issue date of December 7, 2010.

35. In fact, the Bridgeforce Whitepaper is believed to have been in Imrey's possession before the filing of Provisional Patent Application No. 60/620,131 on October 19, 2004.

36. In addition, upon information and belief, Imrey was provided a copy of the published Bridgeforce Whitepaper during a due diligence information exchange between Apollo and Bridgeforce in 2007, at which time Imrey had a duty of disclosure to the PTO.

37. The Bridgeforce Whitepaper is highly material to the prosecution of the '978 Patent, and its related co-pending applications.

38. The following chart illustrates, without limitation, examples of the overlap between the disclosures of the Bridgeforce Whitepaper and issued Claim 1 of the '978 Patent:

| **Claim 1 of U.S. Patent No. 7,848,978; Priority date: Oct. 19, 2004** | **Bridgeforce Whitepaper: "The Future of Collections Management" Date: July 21, 2003** |
|---|---|
| 1. A method for settling a transaction comprising a preexisting financial obligation owed by a user to a party to the preexisting financial obligation, comprising: | *See, e.g.*, "Web and Email Technology: The newest technology to be introduced into the collections process is internet technology. While this is relatively new, it is quickly becoming a major factor in the collection attempts of select organizations. Several large card issuers have begun leveraging the web and email not only as another channel to contact customers, but also as another payment channel." (Exhibit "D" at 4.) |
| enabling the user to contact the server, | *See, e.g.*, "When a customer logs into a financial services website there is an opportunity to communicate with the customer in their preferred channel. Companies have begun doing this through several methods, including: alerts, online education programs, pop up windows, and online self service assistance programs. While this channel requires the customer to initiate the contact, it allows the customer to research their options and make payments. In addition, it serves as a reminder for customers who have forgotten to make payments." (*Id.* at 4.) |
| wherein the server is configured to authenticate an identity of the user and | *See, e.g.*, "…customer logs into a financial services website…" (*Id.* at 4.) |
| provide preexisting financial obligation information to the user, including an amount of money currently owed by the user to the party to the preexisting financial obligation; | *See, e.g.*, "Voice Response Unit: … With the new innovations this technology is now interactive and allows customers to pay their account, set up payment plans and perform other more advanced collection actions." (*Id.* at 5.)<br><br>*See, e.g.*, "Systems that will receive files to be worked can include … online account center or internet …" (*Id.* at 9.)<br><br>*See, e.g.*, "Examples of … data used … include: account balance …" (*Id.* at 3.)<br><br>*See, e.g.*, "In the past many collection operations have used … balance as segmentation variables but in the future this should be expanded …" (*Id.* at 8.)<br><br>*See, e.g.*, "Consumer Attitudes Toward Online Financial Services … Almost One-Quarter Will Bank Online … Check/expect to check credit card balance …" (*Id.* at 14.) |

| **Claim 1 of U.S. Patent No. 7,848,978; Priority date: Oct. 19, 2004** | **Bridgeforce Whitepaper: "The Future of Collections Management" Date: July 21. 2003** |
|---|---|
| causing the server to seek available financial information pertinent to an ability of the user to satisfy the preexisting financial obligation from at least one credit bureau; | *See, e.g.*, "Examples of indicators or data used to predefine the strategy or treatments include: account balance, profitability, channel preference, contact history, delinquency history, and external data such as credit bureau scores and detail. This technology can be developed in house or purchased from companies such as London Bridge, American Management Systems, and Fair Isaac." (*Id.* at 3.)<br><br>*See, e.g.*, "The following is an example of how the financial advisor model of collections will work in the near future. Step 1: Pre-Processing: Each night the collections files will be refreshed and put through the pre-processing phase. Additional data will be appended to the collection records for use in segmentation, scoring and treatment assignment. Examples of this additional data include: credit report data, profitability calculations, and additional product or account information." (*Id.* at 8.) |
| processing data from the available financial information at the server using a rules based engine including rules established on behalf of the party to the preexisting financial obligation located at the server; and | *See, e.g.*, "Step 2: Scoring & Treatment Strategy: Once the file has been prepared it will then be evaluated by decision engine technology to score, segment, and recommend the appropriate treatment and channel to address each customer. In the past many collection operations have used days delinquent and balance as segmentation variables but in the future this should be expanded to include more variables such as channel preference, multiple account information, behavioral and risk scores, and balance at risk." (*Id.* at 8.)<br><br>*See, e.g.*, "Moving into the future, many companies are bringing their data into one data store that can then be used to manage all customer interaction efforts, including collections. From a collections standpoint, the advantages include: the additional data to be used in segmentation and treatment strategies, increased efficiencies of collecting multiple accounts in one effort and, most importantly, increased customer satisfaction by communicating with the customer in a more efficient way." (*Id.* at 7.) |

| **Claim 1 of U.S. Patent No. 7,848,978; Priority date: Oct. 19, 2004** | **Bridgeforce Whitepaper: "The Future of Collections Management" Date: July 21, 2003** |
|---|---|
| causing the server to present an offer set to the user based on at least one decision made by the rules based engine, | *See, e.g.*, "Step 3: Operational Execution: Once the treatment and channel has been identified, the decision engine output record will be parsed and passed to the correct system for execution. Systems that will receive files to be worked can include the power dialer, account management system, email management system, online account center or internet, letter system, statement and billing system, and VRU calling system. These systems will then take the appropriate action on the account, and record the result which will then be recorded on the account file." (*Id.* at 9.) |
| the offer set comprising at least one individually selectable monetary offer selectable by the user including at least one decisioned monetary settlement term determined based on the rules established on behalf of the party to the preexisting financial obligation and available financial information, | *See* discussion, *supra*; *see, e.g.*, "4) Capture as much data as possible for evaluation and use in the decision process. In order to refine these new strategies data will be needed to measure the results." (*Id.* at 10.)<br><br>*See, e.g.*, "Step 4: Measurement and Strategy Refinement: Once the treatments have been executed automatically or through the operations centers, the results will be measured and all data gathered. The process is then repeated with the new results and data taken into account during the scoring and treatment step of the process." (*Id.* at 9.) |
| each individually selectable monetary offer selectable by a user to settle the transaction; | *See, e.g.*, "Internet: Online collections ... all other channels such as statements, letters and VRU/IVR should reference this channel as another option for the customer to address their financial issues and set up payment arrangements." (*Id.* at 6.) |
| wherein the server requires no debt recovery product be accepted by the user to settle the transaction. | *See, e.g.*, "... reminder that customers can now pay their bills online. ... customer should be hearing about ... special payment programs they can enroll into." (*Id.* at P. 10.) |

39. Apollo specifically "stresse[d]" to the PTO that the prior art of record did not "contemplate presenting an offer set, nor seeking available information pertinent to the transaction from at least one source external to the server and user." (*See* Response to Office Action, U.S. Patent Application No. 11/372,588, at 7 (entered Jan. 30, 2009) (attached hereto as Exhibit "Q").) By contrast, the Bridgeforce Whitepaper expressly teaches using technology that offers customers the opportunity to "research their options and make payments" as well as "set up payment plans and perform other more advanced collections actions," and provides an "option for the customer to address their financial issues and set up payment arrangements." (*See*

Exhibit "D" at 4, 5, 6.) The Bridgeforce Whitepaper also teaches that this new collections technology may utilize "indicators or data" such as "account balance, profitability, channel preference, contact history, delinquency history, and external data such as credit bureau scores and detail." (*Id.* at 3.)

40. Therefore, upon information and belief, Imrey's failure to disclose the Bridgeforce Whitepaper to the PTO was done with the intent to deceive the PTO about the prior public disclosure of automated debt collection concepts to use a debtor's available financial information, including credit bureau data, to make decisioned debt settlement offers, including "payment plans" and "special payment programs," where the debt settlement options do not require obtaining a new debt instrument or new line of credit.

41. Upon information and belief, at least some of the concepts Imrey claims to have "invented" came from information Imrey originally obtained from Bridgeforce, including the Bridgeforce Whitepaper.

42. Accordingly, upon information and belief, Apollo knew of the Bridgeforce Whitepaper, knew that it was material, and made a deliberate decision to withhold it. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the Bridgeforce Whitepaper, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

***MyEasyPayment.com***

43. During a deposition in a litigation filed by Bank of America ("B of A"), Imrey testified that, in October 2005, he began conversations with B of A representatives for Apollo to provide "a web-based collections solution" to B of A. (*See* Plaintiff Bank of America N.A.'s

Direct Testimony Deposition Designations of G. Christopher Imrey, at 11:6-19 (Sep. 23, 2010) ("Imrey Dep.") (attached hereto as Exhibit "E").)

44. Imrey also explained at his deposition that during the October 2005 meeting, B of A's "existing solution" for web-based collections was discussed. (*See* Exhibit "E" at 20:16-18.)

45. B of A's "existing solution" was designed and developed by Douglas-Danielle, Inc. (which was eventually acquired by and became a division within TransUnion) (hereinafter, "DDI"). (*See* "Credit Card Issuers Take a Hard Look at the Soft Side of Collections; Bank of America Puts the Web to Work as a Customer-Friendly Collections Tool," Business Wire (July 5, 2002) (attached hereto as Exhibit "F").)

46. B of A launched this web-based debt collections solution in 2001 through its URL: www.MyEasyPayment.com. (*Id.*)

47. This www.MyEasyPayment.com prior art solution allowed delinquent credit cart holders to log in to the system, go "through a fast, focused process", and "agree to recommended alternate payment terms." (*Id.*)

48. The solution was driven by decision engine rules premised on a debtor's credit status, for example, it was only available to "customers with decent payment histories." (*Id.*)

49. In fact, Imrey testified that he discussed with B of A in October 2005 that the DDI system provided B of A a "Web-based collections portal" with "hard-coded . . . rules and decision elements." (Exhibit "E" at 20:20-25.)

50. Imrey further testified that he was made aware in October 2005 that the prior art collections system used by B of A "incorporate[d]" credit "bureau data" as part of its collections "scoring and analytics", *i.e.*, decisioning. (Exhibit "E" at 43:13-23.)

51. The DDI designed and developed solution for B of A, accessible through www.MyEasyPayment.com as early as 2001, is highly material to the patentability of the claims of the '978 Patent.

52. Information concerning this prior art system, including its public use prior to Apollo's earliest patent application filing date, was known to Imrey at least by October 2005.

53. Imrey failed to disclose any information concerning the prior art B of A web-based collections portal or www.MyEasyPayment.com to the PTO during the prosecution of the '588 Application, or any applications related to the '588 Application.

54. Apollo specifically "stresse[d]" to the PTO that the prior art of record did not "contemplate presenting an offer set, nor seeking available information pertinent to the transaction from at least one source external to the server and user." (*See* Exhibit "Q" at 7.) By contrast, the B of A system used credit bureau data to make decisioned debt settlement offers, where the debt settlement options did not require obtaining a new debt instrument or new line of credit. (Exhibit "E" at 43:13-23.)

55. Therefore, upon information and belief, Imrey and his agents intentionally withheld information from the PTO concerning the prior art www.MyEasyPayment.com solution to keep the PTO from discovering the existence of a prior art automated debt collections system that used a debtor's available financial information, including credit bureau data, to make decisioned debt settlement offers, where the debt settlement options did not require obtaining a new debt instrument or new line of credit.

56. Upon information and belief Imrey withheld this information to prevent the PTO from denying Apollo its patent claims directed to an automated collections solution.

57. Accordingly, upon information and belief, Apollo knew of the www.MyEasyPayment.com prior art, knew that it was material, and made a deliberate decision to withhold it. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the www.MyEasyPayment.com prior art, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

***Prior Art Known Through Industry Conferences***

58. Imrey was also made aware of other prior art web-based collection systems through his attendance and participation in industry conferences.

59. One such instance was Imrey's participation as a panelist on a panel entitled "Web-Based Collections: Trends and Perspectives" at the Ninth Annual National Collections and Credit Risk Conference on March 21, 2005 in Las Vegas, Nevada. (*See* Agenda Excerpt, Ninth Annual National Collections and Credit Risk Conference (March 20, 2005) (attached hereto as Exhibit "G").)

60. In addition to Imrey, the panel included the following participants: Tom Brown, Senior Vice President for Chase Card Services (hereinafter, "Chase"); Tom Butler, Senior Vice President for B of A; Michael Browning, CEO of DDI; and Bill Kinnelly, Vice President of Sales and Marketing for Online Resources Corporation (hereinafter, "ORCC"). (*Id.*)

61. The panel presentation occurred just five months after Imrey filed his earliest provisional patent application and one year before the '588 Application was filed.

62. During the presentation, Imrey heard from each of these company representative about their experiences and perspectives regarding their own prior art web-based collection systems. (*See* Matt Scarborough, Business Solution Practice Director, Moderator for Web-Based

Collections: Trends and Perspectives Panel, "Questions for Web Collections Panel," Ninth Annual National Collections & Credit Risk Conference (March 21, 2005) (attached hereto as Exhibit "H").) Mr. Brown discussed Chase's web-based collections system launched in April 2004, designed by Incurrent (acquired in late 2004 by ORCC) through the assistance of Bridgeforce. (*See* Flow Diagram of a Web-based "Collections System Environment" for Chase (Oct. 6, 2003) (attached hereto as Exhibit "I").) B of A's representative, Mr. Butler, discussed the www.MyEasyPayment.com web-based collections solution which, as discussed above, launched in 2001. Mr. Browning of DDI discussed a web-based collections solution DDI marketed under the trade name "Smart Collections" since at least 2003. (*See* Online Payment Management Presentation, Douglas-Danielle, a TransUnion Company (March 21, 2005) (attached hereto as Exhibit "J"); Case Study, "Reducing Cost-per-Collection with SMART*Collections* an Online Self-Service Solution," Douglas-Danielle Inc. Web Site (Oct. 9, 2003) (attached hereto as Exhibit "K") *available at* http://www.Archive.org.)

63. Accordingly, information concerning these prior art systems was known to Imrey at least as early as March 21, 2005, if not before.

64. Imrey failed to disclose any information concerning these prior art systems to the PTO during the prosecution of the '588 Application, or any applications related to the '588 Application.

65. Upon information and belief, Imrey and his agents intentionally withheld information from the PTO concerning these prior art systems to keep the PTO from discovering their existence and denying Apollo its patent claims directed to a web-based collections solution.

66. Accordingly, upon information and belief, Apollo knew of these prior art web-based collection systems, knew that they were material, and made a deliberate decision to

withhold them. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the prior art web-based collection systems, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

***Material Rejections and Art from Co-pending Applications***

67. According to the Manual of Patent Examination Procedures (hereinafter, "MPEP"), "the duty of candor includes a specific requirement to disclose "information relating to or from co-pending applications." (MPEP § 2001.06(b).) Specifically, the MPEP requires that any person involved with a patent application who possesses a duty of disclosure must "bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are "material to patentability" of the application in question." (*Id.*) "[T]he prior art references from one application must be made of record in another subsequent application if such prior art references are "material to patentability" of the subsequent application." (*Id.*) In addition, "material rejections in co-pending applications fall squarely within the duty of candor." *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 923 (Fed. Cir. 2007).

68. During the prosecution of the '588 Application, five related Apollo applications were co-pending. The co-pending Apollo applications are/were U.S. Application Nos.: 11/256,404 (Docket No. APOL0007, hereinafter, "the '404 Application"); 11/256,405 (Docket No. APOL0006, hereinafter, "the '405 Application"); 11/256,406 (Docket No. APOL0005, hereinafter, "the '406 Application"); 11/372,767 (Docket No. APOL0010, hereinafter, "the '767 Application"); and 11/372,850 (Docket No. APOL0009, hereinafter, "the '850 Application").

These applications are all related to one another because each claims priority to Apollo's Provisional Application No. 60/620,131, filed October 19, 2004.

69. Information from each of these applications were highly material to the patentability of the claims of the '978 Patent and were, upon information and belief, intentionally withheld from the prosecution of the '588 Application to deceive the PTO.

70. Notably, the '588 Application was the only one of Apollo's six co-pending applications pending before Examiner Frantzy Poinvil. The '404 and '405 Applications are still pending today (after more than five years of prosecution) before Examiner Hatem Ali. The '406 and '850 Applications were before Examiner Kito Robinson, with the '406 Application still pending after more than five years while the '850 Application issued as U.S. Patent No. 7,818,229 (the '229 Patent) in October 2010. The '767 Application was before Examiners Brian Fertig and Mary Cheung, and issued as U.S. Patent No. 7,814,005 (the '005 Patent) in October 2010.

71. Apollo provided CMC with a covenant not to sue with respect to the '229 and '005 Patents.

72. The pendency of Apollo's related applications before different examiners only heightens Apollo's obligation to disclose material information from the co-pending applications. It is "important for [an examiner] to know that another knowledgeable Patent Examiner had carefully examined and rejected all claims of [another] application, including claims that were directly related to claims in the [present] application, on the grounds that the claims were obvious in light of prior art patents. Without such a disclosure requirement applicants [may] surreptitiously file repeated or multiple applications in an attempt to find a 'friendly' Examiner."

*Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed.Cir.2003) (internal citations and quotations omitted).

73. Apollo's disregard for this obligation is readily apparent from a review of the prosecution history of the '588 Application as compared to the prosecution histories of the co-pending applications.

74. At least the following material rejections in the co-pending applications were withheld from Examiner Poinvil during the prosecution of the '588 Application: Office Action dated June 23, 2008 in U.S. App No. 11/256,406 (Docket No. APOL0005); Office Action dated January 26, 2009 in U.S. App No. 11/256,406 (Docket No. APOL0005); Office Action dated September 16, 2009 in U.S. App No. 11/256,406 (Docket No. APOL0005); Office Action dated May 21, 2008 in U.S. App No. 11/256,405 (Docket No. APOL0006); Office Action dated January 8, 2009 in U.S. App No. 11/256,405 (Docket No. APOL0006); Office Action dated June 11, 2009 in U.S. App No. 11/256,405 (Docket No. APOL0006); Office Action dated December 7, 2009 in U.S. App No. 11/256,405 (Docket No. APOL0006); Office Action dated September 13, 2010 in U.S. App No. 11/256,405 (Docket No. APOL0006); Office Action dated May 8, 2008 in U.S. App No. 11/256,404 (Docket No. APOL0007); Office Action dated December 26, 2008 in U.S. App No. 11/256,404 (Docket No. APOL0007); Office Action dated July 20, 2009 in U.S. App No. 11/256,404 (Docket No. APOL0007); Office Action November 27, 2009 in U.S. App No. 11/256,404 (APOL0007); Office Action September 13, 2010 in U.S. App No. 11/256,404 (APOL0007); Written Opinion dated January 30, 2007 in PCT App No. PCT/US05/37949 (Docket No. APOL0008); Office Action January 14, 2007 in U.S. App No. 11/372,850 (APOL0009); Office Action June 19, 2008 in U.S. App No. 11/372,850 (APOL0009); Office Action July 21, 2009 in U.S. App No. 11/372,850 (APOL0009); Office

Action January 28, 2010 in U.S. App No. 11/372,850 (APOL0009); Office Action dated April 18, 2008 in U.S. App No. 11/372,767 (Docket No. APOL0010); Office Action dated October 30, 2008 in U.S. App No. 11/372,767 (Docket No. APOL0010); Office Action dated April 20, 2009 in U.S. App No. 11/372,767 (Docket No. APOL0010); Office Action dated November 23, 2009 in U.S. App No. 11/372,767 (Docket No. APOL0010).

75. These rejections withheld from Examiner Poinvil were highly material to the patentability of the claims of the '978 Patent as evidenced by the fact that they were disclosed by Apollo to Examiner Robinson in the '406 Application on July 26, 2010, which included nearly identical claims to the claims of the '978 Patent.

76. For example, the following chart compares the primary independent claim in the '406 Application pending on July 26, 2010, to the primary independent claim issued in the '978 Patent:

| **Claim 1 of U.S. Patent No. 7,848,978; Priority date: Oct. 19, 2004** | **'406 Application Claim 41 As of 7/26/2010** |
|---|---|
| 1. A method for settling a transaction comprising a preexisting financial obligation owed by a user to a party to the preexisting financial obligation, comprising: | 41. (currently amended) A method for settling a debt performed using a computing device and comprising: |
| enabling the user to contact the server, wherein the server is configured to authenticate an identity of the user and provide preexisting financial obligation information to the user, including an amount of money currently owed by the user to the party to the preexisting financial obligation; | receiving information, at a server, regarding the debt; |
| causing the server to seek available financial information pertinent to an ability of the user to satisfy the preexisting financial obligation from at least one credit bureau; | seeking available information comprising factors pertinent to a user's ability to repay the debt from at least one source external to the server; |
| processing data from the available financial information at the server using a rules based engine including rules established on behalf of the party to the preexisting financial obligation | processing data from the available information using a rules based engine including rules established on behalf of a party to the debt located at the server; and |

| | |
|---|---|
| located at the server; and | |
| causing the server to present an offer set to the user based on at least one decision made by the rules based engine, the offer set comprising at least one individually selectable monetary offer selectable by the user including at least one decisioned monetary settlement term determined based on the rules established on behalf of the party to the preexisting financial obligation and available financial information, each individually selectable monetary offer selectable by a user to settle the transaction; | presenting a transaction settlement offer set to the user based on at least one decision made by the rules based engine, the transaction settlement offer set comprising at least one individually selectable monetary offer including at least one decisioned monetary settlement term based on the rules established on behalf of the party to the debt and available information, each individually selectable monetary offer selectable by a the user to establish settlement of the debt; |
| wherein the server requires no debt recovery product be accepted by the user to settle the transaction. | wherein each decisioned monetary settlement term is not a debt recovery product and settlement of the debt does not require the user to accept a debt recovery product. |

77. The above chart provides an illustrative example of how similar at least some of Apollo's other pending patent claims are and were to the issued claims of the '978 Patent.

78. Despite the similarity of the claims, Imrey and his attorneys failed to disclose the rejections of these pending claims to Examiner Poinvil during the prosecution of the '588 Application.

79. Therefore, upon information and belief, Imrey and his attorneys intentionally withheld this information from Examiner Poinvil to keep Examiner Poinvil from reviewing the rejections of nearly identical claims by his PTO examiner colleagues.

80. Upon information and belief, Imrey and his attorneys intentionally withheld this information in an effort to prevent the PTO from rejecting the patent claims that ultimately issued in the '978 Patent.

81. Imrey and his patent attorneys further breached their duty of candor by withholding from Examiner Poinvil dozens of prior art references relied upon by Examiners Ali, Robinson, and Fertig/Cheung to reject many similar claims being prosecuted by Apollo.

82. At least the following U.S. Publications and Patents cited and/or disclosed in the co-pending applications were withheld from Examiner Poinvil during the prosecution of the '588 Application: 20010039523 (Iwamoto); 20020046065 (Nighan); 20020059139 (Evans); 20020069182 (Dwyer); 20020077964 (Brody); 20020128960 (Lambiotte); 20030036996 (Lazorson); 20030050929 (Bookman); 20030055783 (Cataline); 20030060929 (Bookman); 20030074290 (Clore); 20030078881 (Elliott); 20030083984 (Crawford); 20030187796 (Swift); 20030212630 (Kahr); 20030229580 (Gass); 20030233292 (Mandler); 20030233292 (Richey); 20040039687 (Lent); 20040059671 (Nozaki); 20040111359 (Hudock); 20040133513 (McCoy); 20040133514 (Zlelke); 20040199456 (Flint); 20040226995 (Smith); 20040243508 (Samson); 20050004870 (McGaughey); 20050182713 (Marchesi); 20060031158 (Orman); 20060062375 (Pasquale); 20060080186 (Burchetta); 20060106717 (Randle); 20070005498 (Cataline); 20070106573 (Burchetta); 20070106621 (Burchetta); 20070118486 (Burchetta); 20070150377 (Burchetta); 20070299771 (Brody); 20080065557 (Burchetta); 20080065558 (Burchetta); 20080114679 (Burchetta); 20080126254 (Burchetta); 20080126266 (Burchetta); 20080140852 (Burchetta); 5,616,902 (Cooley); 5,699,528 (Hogan); 5,956,700 (Landry); 5,991,733 (Aleia); 7,076,444 (Baron); 7,076,462 (Nelson); 7,249,114 (Burchetta); 7,536,336 (Guinan). At least the following foreign patent reference cited in an international search report for a related international (PCT) patent application and disclosed in the co-pending applications was withheld from Examiner Poinvil during the prosecution of the '588 Application: WO2004029850 (Bratvold).

83. Imrey and his agents failed to disclose each and every item of the above identified references to Examiner Poinvil during the prosecution of the '588 Application.

84. Upon information and belief, Imrey and his attorneys intentionally withheld this information from Examiner Poinvil to keep Examiner Poinvil from reviewing this prior art and denying Apollo the patent claims that ultimately issued in the '978 Patent.

85. Accordingly, Apollo knew of the material rejections and prior art from the co-pending applications, knew that they were material, and made a deliberate decision to withhold them. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the material rejections and prior art from the co-pending applications, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

***The www.GlobalCollectionSystems.com System***

86. Apollo was well aware of a prior art web-based collections system by Global Collection Systems, Inc. (hereinafter, "GCS"). In particular, Apollo's patent attorney, John King of the law firm Knobbe Martens, Olson & Bear, LLP, studied the website for GCS: www.globalcollectionsystems.com.

87. On August 30, 2006 Mr. King executed and filed in the '406 Application prosecution an "Attorney's Declaration" supporting a "Petition to Make Special" to accelerate the prosecution of this application because "an infringing device . . . from the Global Collection Systems, Inc. website, www.globalcollectionsystems.com . . . is actually on the market." (*See* Petition to Make Special and Attorney's Declaration Supporting Petition to Make Special, U.S. Patent Application No. 11/256,406, at 3, ¶ 2 (Aug. 30, 2006) (attached hereto as Exhibit "L").)

88. Mr. King further declared in the petition that he "made a rigid comparison of the Device with the claims of the Application[,] ... [that in his] opinion, some of the claims of the

Application are unquestionably infringed.... [and that he] caused to be made a careful and thorough search of the prior art...." (*Id.* at ¶ 4.)

89. Upon information and belief, at the time of the "Attorney's Declaration", Imrey was President of Apollo and was also aware of these details concerning the GCS website and the alleged bases of infringement.

90. Mr. King included with his petition screen shots from the demonstration link of www.globalcollectionsystems.com. (*Id.* at 5-13.) Each of these screen shots reveal: (a) a copyright date at the bottom of each screen shot indicating that the content of www.globalcollectionsystems.com website had been copyrighted since 2003, well before the Apollo's earliest possible priority date; and (b) the URL for the demonstration link of the website is www.gcs7.com, which has been an active public site since 2003. (*See* hereto, Screenshot from http://www.gcs7.com (cached Dec. 14, 2003) (attached hereto as Exhibit "M") *available at* http://www.archive.org). Further, the GSC website states that it "has been providing online debt negotiation and payment services to the financial services industry since 2003." *See* http://www.globalcollectionsystems.com/AboutUs.aspx (last visited March 22, 2011).

91. The GSC online debt negotiation and payment system is highly material to the patentability of the claims of the '978 Patent.

92. Upon information and believe, GSC online debt negotiation and payment system was known to Imrey and his attorneys, including at least patent attorney John King (at least as early as September 5, 2006), that the GCS system was publicly available prior to the filing of Apollo's earliest priority patent applications.

93. First, Imrey and Mr. King failed to disclose to Examiner Robinson in the '406 Application that the GSC system, sworn to be within the scope of pending claims that (as

described above) were nearly identical to the claims of the '978 Patent, actually predated Apollo's earliest possible priority date.

94. Second, Imrey and Mr. King failed to disclose to Examiner Poinvil in the '588 Application the existence of the GCS online debt negotiation and payment service website.

95. Upon information and belief, Imrey and his agents intentionally withheld from Examiner Poinvil information concerning the GCS system to keep the Examiner Poinvil from denying Apollo patent claims directed to a web-based collections solution.

96. Accordingly, Apollo knew of information from the GSC online debt negotiation and payment system, knew that it was material, and made a deliberate decision to withhold it. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the material information from the GSC online debt negotiation and payment system, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

***The Debt Resolve Litigation***

97. According to the MPEP, "the duty of candor includes a specific requirement to disclose the existence of a litigation involving "the subject matter for which a patent is being sought" and "other material information arising therefrom." (MPEP § 2001.06(c).)

98. A litigation "related" to the subject matter of the pending claims of the '978 Patent was filed by Debt Resolve, Inc. ("Debt Resolve") against Apollo in January of 2007.

99. The suit involved accusations of patent infringement by Debt Resolve against Apollo's Intelligent Debt Solution ("IDS") internet-based debtor self-payment system. (*See* Memorandum of Law in Support of [Apollo's] Motion for Summary Judgment of Patent Non-

Infringement, *Debt Resolve, Inc. v. Apollo Enter. Solutions, Inc.*, Case No. 07-cv-4531(JSR), at 1 (S.D.N.Y. Aug. 31, 2007) (attached hereto as Exhibit "N").)

100. Apollo admitted during the Debt Resolve litigation that its "accused IDS system" was covered by a provisional patent application filed on October 19, 2004. (*Id.* at 2, 9.)

101. Apollo denied that its system and the subject matter of its patent applications were within the scope of the asserted Debt Resolve patents. (*Id.* at 2.)

102. Debt Resolve countered that Apollo's system was, in fact, within the scope of Debt Resolve's patent claims as evidenced by the disclosures in Apollo published patent applications, which both parties used to characterize the technology in dispute. (*See* Debt Resolve's Opposition to Apollo's Motion for Summary Judgment of Patent Non-infringement, *Debt Resolve, Inc. v. Apollo Enter. Solutions, Inc.*, Case No. 07-cv-4531(JSR), at 8 (attached hereto as Exhibit "O").)

103. While the parties ultimately settled the litigation and published a release stating that "Apollo's Intelligent Debt Solutions™ system, as represented by Apollo, does not infringe on Debt Resolve's . . . Patents," the litigation remains highly material to the '978 patent. (*See* http://www.debtresolve.com/pdfs/PR_20071105_SettleApolloLawsuit.pdf (last visited March 23, 2011).)

104. For example, any statements made during the Debt Resolve litigation about the scope of Apollo's pending claims would likely have been material in assessing the patentability of those described claims.

105. As another example, any statements made during the Debt Resolve litigation about how Debt Resolve's patent claims cover the claimed Apollo technology would likely have been material to Apollo's pending patent claims.

106. In fact, Examiner Poinvil rejected the majority of Apollo's pending claims in the '588 Application (including all independent claims) as anticipated by Debt Resolve's asserted U.S. Patent No. 6,330,551 (hereinafter, "Burchetta"), which, as referenced above, was asserted in the Debt Resolve litigation. (*See* Office Action, Non-Final Rejection, U.S. Patent Application No. 11/372,588 (Sep. 24, 2008) (attached hereto as Exhibit "P").) In response, Apollo "traversed" the objection by arguing, *inter alia*, as follows:

> Burchetta does not present a transaction offer settlement set based on at least one decision made by a rules based engine. Simply put, Burchetta provides offers in "rounds" and decides that the transaction is satisfied when the difference between offers is within a threshold. What Burchetta does not do is present a transaction offer settlement set based on at least one decision made by the rules based engine. The simple act of providing offers in rounds is not based on decisions made by a rules based engine.

(*See* Exhibit "Q" (emphasis in the original).)

107. By contrast, during the litigation, Debt Resolve provided a chart comparison of the publicized "decision engine" feature of the Apollo technology to the comparable claim element of the Burchetta Patent:

| **Claim 131 [of the Burchetta Patent]** | **Apollo's System** |
|---|---|
| ... | ... |
| Calculates a settlement amount to be paid by one entity to another entity if a pair of the monetary values differ from each other within the specified range based upon the pair and then discards the pair, and ... | the "decision engine" calculates the amount of the settlement if the debtor's offer is within the range specified by the rules input by the creditor ... |

(*See* Exhibit "O" at 23-24.)

108. This "decision engine" feature information from the Debt Resolve Litigation was highly material to Examiner Poinvil's consideration of the patentability of the '978 Patent claims and, in particular, Apollo's attempt to overcome Examiner Poinvil's rejection by characterizing

the Burchetta Patent as distinguishable based on the claim element of a "decision made by the rules based engine."

109. Examiner Poinvil did not have the opportunity to consider the disclosures and arguments made during the Debt Resolve litigation or any aspect of that litigation because Imrey and his agents withheld the existence of this litigation from the PTO.

110. Upon information and belief, Imrey and his agents intentionally withheld from Examiner Poinvil the existence of the Debt Resolve litigation to keep Examiner Poinvil from discovering incongruent arguments made regarding the applicability of the Debt Resolve patents to the claims of the '978 Patent.

111. Accordingly, Apollo knew of information from the disclosures and arguments made during the Debt Resolve litigation or any aspect of that litigation, knew that it was material, and made a deliberate decision to withhold it. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the material information from the disclosures and arguments made during the Debt Resolve litigation or any aspect of that litigation, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

***<u>The www.DebtResolve.com System</u>***

112. Debt Resolve's commercial system for online debt resolution was publicly available through its website www.DebtResolve.com prior to Apollo's earliest priority filing date for its patents, including the '978 Patent. (*See* DebtResolve.com Web Site (Aug. 4, 2003) (attached hereto as Exhibit "R") *available at* http://www.waybackmachine.org.)

113. In fact, Imrey testified that Apollo's patent attorneys directly asked representatives of Apollo, including Imrey, "if we knew of any existing 'prior art' or intellectual property or

similar company offerings and we identified Debt Resolve and Debt Resolve's licensed patents from Cybersettle." (*See* Declaration of Christopher Imrey in Support of Apollo Enterprise Solutions, LLC's Motion to Disqualify Greenberg Taurig, LLP, *Apollo Enter. Solutions, LLC v. Debt Resolve, Inc.*, Civil Case No. SACV07-106 VBF (JTLx), at ¶6 (C.D. Cal. March 23, 2007) (attached hereto as Exhibit "S").)

114. In addition, Imrey testified that on October 24, 2004, five days after his provisional application was filed, he "as well as a few other Apollo officers and directors, met with [Apollo's patent attorneys and] specifically discussed Debt Resolve, its products and patents." (*Id.* at ¶ 8.)

115. Despite this clear demonstration of knowledge by Imrey and his patent attorneys about Debt Resolve, Imrey and his patent attorneys withheld information concerning the Debt Resolve product and litigation.

116. The Debt Resolve product allowed for debt resolution decisioning based on a "financial institution's settlement parameters, [thus allowing] the dispute [to be] resolved in real time when the creditor visits the Website." (*See* Michael Sisk, "Debt Resolve is Bringing The Repo Man to the Web: Firm Touts a Kinder, Gentler Way to Collect Overdue Debts," Bank Technology News, HighBeam Business (Sep. 1, 2003) (attached hereto as Exhibit "T").)

117. The capabilities of the Debt Resolve product are in direct contrast to Apollo's characterization of the Debt Resolve Burchetta Patent as failing to teach the concept of making a settlement offer based a decision made by the rules based engine, as described above.

118. Upon information and belief, Imrey and his agents intentionally withheld from Examiner Poinvil information about the existence of Debt Resolve online product to keep Examiner Poinvil from discovering additional features in use by Debt Resolve that would

conflict with Apollo's arguments made regarding the patentability of the claims of the '978 Patent.

119. Accordingly, Apollo knew of information from Debt Resolve's publicly available commercial system for online debt resolution, knew that it was material, and made a deliberate decision to withhold it. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose the material information from Debt Resolve's publicly available commercial system for online debt resolution, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

**FEDERAL DECLARATORY JUDGMENT ACT**

120. Pursuant to the Federal Declaratory Judgment Act, Title 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party.

121. As set forth above and in the Cease and Desist Letter, Defendant has asserted that CMC infringed Defendant's '978 Patent ("Enhanced Transaction Resolution Techniques").

122. There exists a real and actual substantial controversy between CMC and Defendant.

123. CMC and Apollo have adverse legal interests with respect to the threats of Patent Infringement made by Apollo against CMC reseller-partners and customers, and CMC indirectly.

124. There exist antagonistic claims indicating sufficient immediacy, and imminent and inevitable litigation.

125. The interests of the parties will be best served if this Court will enter a Declaratory Judgment setting forth the rights of the parties with respect to this dispute.

126. The relief sought by CMC will resolve the controversy relative to the respective interests of CMC and Defendant.

127. CMC seeks a Declaratory Judgment from this Court that CMC has not infringed the '978 Patent, that the '978 Patent is invalid, that the '978 is unenforceable, and that CMC be awarded its fees and costs.

## COUNT I
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '978 PATENT

128. Each of paragraphs 1 through 26 are incorporated herein by reference.

129. Apollo is the owner of the '978 Patent.

130. CMC has not infringed and does not infringe any valid claim of the '978 Patent.

131. There is an actual, substantial and immediate controversy between the adverse interests of CMC and the Defendant as to whether CMC using, making, sales, or offers for sale of its browser-accessible credit and collections software solutions infringes the claims of the '978 Patent.

132. Defendant's policy of aggressively pursuing allegations of infringement of the '978 Patent against CMC via its customers, and the threatening statements by Apollo's attorneys and sales personnel directed to CMC reseller-partners, customers, and CMC via Cease and Desist letters, demonstrates sufficient immediacy of the controversy to warrant issuance of a Declaratory Judgment.

133. CMC is entitled to a Judicial Declaration and Order that CMC has not infringed and does not infringe, directly, by inducement or by contribution, any valid claim of the '978 Patent.

**COUNT II**
**DECLARATION OF INVALIDITY OF THE '978 PATENT**

134. Each of paragraphs 1 through 119 are incorporated herein by reference.

135. Apollo is the owner of the '978 Patent.

136. The '978 Patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United State Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103 and 112.

137. An actual, substantial and immediate controversy exists between CMC and Defendant as to whether the claims of the '978 Patent are valid.

138. CMC is entitled to a Judicial Declaration and order that the '978 Patent is invalid.

**COUNT III**
**DECLARATION OF UNENFORCEABILITY OF THE '978 PATENT FOR INEQUITABLE CONDUCT**

139. Each of paragraphs 1 through 119 are incorporated herein by reference.

140. Apollo is the owner of the '978 Patent.

141. The '978 Patent is unenforceable because of the inequitable conduct of Apollo representatives, including at least G. Christopher Imrey, in light of the actions and inactions described herein in violation of the duty of candor owed to the PTO during the prosecution of the '588 Application and related applications.

142. Accordingly, Apollo knew of prior art withheld from the PTO, knew that it was material, and made a deliberate decision to withhold it. Apollo thus engaged in egregious misconduct before the PTO where that misconduct is material and affected the issuance of the '978 Patent. Further, but for Apollo's failure to disclose prior art, the PTO would not have allowed any of the claims found in the '978 Application which later issued as the '978 Patent.

143. Apollo wrongfully asserted and continues to assert the unenforceable '978 Patent against CMC as described herein, and as further evidenced by Apollo's Counterclaims.

144. CMC is entitled to a Judicial Declaration and Order of unenforceability of the '978 Patent.

145. CMC is entitled to a Judicial Declaration that this is an "exceptional case" under 35 U.S.C. § 285.

146. CMC is entitled to an award of attorneys' fees, costs and other reasonable expenses incurred to defend against the aforementioned wrongfully asserted, unenforceable '978 Patent due to Apollo's inequitable conduct.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, CMC hereby respectfully request trial by jury of all issues triable of right by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, CMC respectfully request that the Court enter judgment in their favor and against the Defendant as follows:

A. The Court enter judgment that the '978 Patent is invalid;

B. The Court enter judgment that CMC does not infringe and has not infringed, directly or indirectly, literally or under the Doctrine of Equivalents, the '978 Patent;

C. The Court enter a judgment that the '978 Patent is unenforceable;

D. The Court enjoin Apollo, its officers, agents, attorneys, employees and those in active concert with them from interfering in any way with the marketing and sale and/or continued maintenance of CMC's accounts for its browser-accessible credit and collections software solutions, based on any alleged infringement of the '978 Patent;

E. The Court find this case to be an "exceptional case" pursuant to 35 U.S.C. § 285

and award CMC its attorneys' fees in this action; and

F. The Court enter an order for such other and further relief as this Court deems just and proper.

Dated: August 9, 2011

Respectfully submitted,

*/s/ James H. S. Levine*
James H.S. Levine (Del. Bar No. 5355)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6536
Facsimile: 866.679.6592
levinejh@pepperlaw.com

Of Counsel
M. Kelly Tillery (PA30380)
Christopher D. Olszyk, Jr.(PA203712)
Desa L. Burton (PA310691)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: 215.981.4000
Facsimile: 215.981.4750
tilleryk@pepperlaw.com
olszykc@pepperlaw.com
burtond@pepperlaw.com

***Attorneys for Plaintiff Collections Marketing Center, Inc.***